Next case is 513-0049-WC, Gary Bruce v. Pellants v. Workers' Compensation Comm'n, related to the carrier dealership in Bethlehem. Ms. Rich, you may proceed when ready. Thank you, Your Honor. May it please the Court, Mr. Reddick, my name is Michelle Rich, I represent the appellant in this case, Mr. Gary Gibbons. Just by way of background, this is a case, the accident is not disputed. The main issue today will be causal connection. My client, Mr. Gibbons, works as a prison guard, however, he volunteers his time, outside of that, as a volunteer firefighter for the village of Carrier Mills. One day, when he was working as a firefighter, he was responding to a fire. He was in a smoky room. He testified that he stepped off a platform. He was not aware he was on a platform because the room was filled with smoke. He stepped off the platform, twisted his knee, and slid back against the wall. At the time of the accident, he was wearing, as you can imagine, a heavy amount of gear, approximately 80 pounds, and a firefighter's hat with a three-inch brim around it. And Mr. Gibbons was testified, he testified at trial, and he was questioned extensively about whether he hit his head on the wall as he fell. And he unequivocally testified he described the accident as sliding down the wall. And when asked, did you hit your head, he said yes. And as you can imagine, to him, he's a firefighter who knows what type of gear he's wearing. He knows he's wearing a three-inch long brim hat. So to him, it's not a question because the hat is so large. Yes, he hit his head when he's going down the wall, when he slid down. When did he first complain about head injury or neck injury? Wasn't it like four months later or something? Yes, Your Honor, that's correct. Wasn't that an issue that troubled the commission, this delay in reporting any type of a problem with his head or his neck? Yes, that was something that has been discussed by the commission, and Mr. Gibbons testified unequivocally at trial. He doesn't deny that he didn't report any neck symptoms until four months later. He says he, let me backtrack a little bit. When he injured his knee, he completely tore his ACL and his medial meniscus. The ambulance reports that he was in a pain level of 10 out of 10. He was given morphine in the ambulance. He was treated immediately for the knee injury. He underwent two surgeries performed by Dr. Poletta. He testified that he had some soreness initially in his neck, but he had never had any neck problems before, so he didn't know what was going on. He simply thought that he had some soreness from the fall and that it would resolve. However, when his course of treatment began to end for the knee, he received physical therapy. He was under a number of medications at that time. He began to notice that the pain in his neck gradually became worse and didn't resolve, and that's when he sought treatment with Dr. Gornett, who's a spine specialist. Now, he was conscious when he went to the emergency room, right? Yes. The commission also found there was no records to show that he reported any headache or head injury at the emergency room, or he never reported hitting his head at the emergency room, did he? He did testify that he recalled telling the ambulance personnel that he had a headache and some soreness in his neck. The commission found that he wasn't credible. The interesting thing about that, Your Honor, is that if you read the arbitrator's decision, which is in my appendix to my brief, in paragraph one of the arbitrator's conclusions of law, the arbitrator specifically finds for my client, Mr. Gibbons, on the issue of the neck condition and says that it's partially based on petitioner's credible testimony. The commission determined that he wasn't credible based on review of the record as a whole, and noted that the medical record did not support any of his testimony. The commission gave a reason, didn't they? Well, actually, Your Honor, if you read the commission's decision, and this is why I think they got it wrong, they talked about the commission seemed to focus their discussion on Dr. Gornett's correlation of the chest pain or petitioner's lack of chest pain at the time that he sustained the injury. Because Dr. Gornett said that that was one thing, if petitioner had chest pain at the time of the injury, that that could support a neck injury. However, that wasn't Dr. Gornett's entire testimony. He said, yes, that's one supporting factor that could tell me that somebody has had a neck injury, but he also testifies that he based his opinion on the fact that Mr. Gibbons sustained a very severe knee injury and was undergoing treatment extensively for that and was on pain medication, which could have masked his symptoms. Well, I mean, I think you have, clearly you have Gornett testifying in favor of the claimant. You have Grimm opposing Gornett's testimony, essentially, and they could, of course, rely on Grimm. But here's something I would like you to address, because one of the other things that was significant to me in looking at Grimm's report is he opines there's evidence of degenerative pathology in the cervical spine of your client. I mean, that's sort of an objective medical factor, and he believes that would explain the pain in the neck, doesn't he? As to why there might be some neck symptoms, but it was because of a degenerative condition that was preexisting. Well, I think one thing that's important with that, Your Honor, is that before this accident, Mr. Gibbons had never sought any sort of treatment for any sort of neck problem before this. He testified that there had been no prior problems, he never had any neck treatment, and in the interim, between April of 2008 and when he hurt himself in August of 2008, when he saw Dr. Gornett, he had not sustained any additional injuries because he was on crutches from his knee injury. So I think that's significant, and it was also significant to Dr. Gornett that you have somebody who's never had any complaints of neck pain in their life, and then they have this traumatic incident where they slide down a wall. He said that at the very minimum, that aggravates the preexisting condition that was asymptomatic prior to this incident. Let's set that aside for a second. You know what the test of manifest weight is, whether an apposite inclusion is clearly apparent, and when it comes to matters of credibility, the law is well settled. It's up to the commission to determine the credibility of the witnesses and the weight to be given to the testimony. So if you have Grimm on one side, Gornett on the other side, and the commission chooses to believe Grimm, how would that be against the manifest weight of the evidence? Or tell us why that would be against the manifest weight of the evidence. Your Honor, I don't believe that. I just reread the commission's decision as I was waiting, and the commission doesn't specifically find Dr. Grimm to be more credible than Dr. Gornett in their opinion. They simply state that Dr. Gornett's opinion is, quote, speculative because of the lack of chest pain in the emergency room note and in the ambulance note. So they don't specifically state that Grimm is more credible than Dr. Gornett. They at least state they have some problem with Gornett. They don't say that about Grimm. What do we do with the sentence, we disagree with the arbitrator that Dr. Gornett's opinion were more credible than Dr. Grimm's. What does that mean? I think that means that they disagree that Dr. Gornett, like simply what you stated, Your Honor, that they find Gornett to be, they disagree with the arbitrator that Gornett was more credible, but I don't think that contradicts the statement and says that we find Grimm to be more credible than Gornett. Well, you only got one of two choices. Either Gornett's more credible than Grimm, or Grimm is more credible than Gornett. Now, if they turn around and say we disagree with the arbitrator that Dr. Gornett's opinion is more credible than Dr. Grimm, I think that leaves you with only one other conclusion, that according to them, Grimm's opinion is more credible than Gornett's. Well, Your Honor, something I'd like to point out about Dr. Grimm's opinion is that Dr. Grimm doesn't even comment in his report. His report is simply, I believe it's three pages, single-spaced, and Dr. Gornett saw Mr. Gibbons numerous times, performed surgery on him, and his deposition was taken. And Dr. Grimm's report is three pages. He simply reviewed Mr. Gibbons' records. He didn't see him. He never spoke to him. And Dr. Grimm in his report doesn't comment on whether the use of pain medication immediately following the accident could have masked any cervical complaints. Dr. Grimm doesn't even address that, even though that's one of Dr. Gornett's determining factors in his opinion, that this pain medication that he was on could mask symptoms in other parts of his body. Counsel, given the content of what's been discussed here so far and concepts of credibility and weight, does it make you reevaluate what you believe the standard of review here ought to be? I mean, you urge a de novo standard of review, and you agree it's a manifest weight standard? I put in my brief, Your Honor, that I believe a de novo standard applied because to me the facts say what they say, and they are what they are. I don't think any— Well, but that's—you can't conclude. I mean, obviously there's differing opinions on these issues. I mean, how could it be de novo? De novo would be with the facts. It's a question of law. The facts are not in dispute. You're saying the facts are not in dispute? Well— If the commission makes findings of fact, that's the class that comes manifest weight of the evidence. They're making findings here. I think an argument can be made either way, but even if the standard is manifest weight of the evidence, Your Honors, I still do think that there's enough evidence to overturn the commission's decision here. The arbitrator, I think, got it right in this case because he was able to watch petitioner testify for over half an hour at the hearing. And something that I've noticed when I've been before the commission in oral arguments, Michael Latz, who's the current chairman, who was a commissioner at that time, has said in front of a room full of attorneys that even though the commission is the finder of fact and the trier of fact in cases, that the commission always gives deference to the opinions of an arbitrator when it comes to the credibility of a petitioner because they're the ones who sit and watch them testify. So I think that's significant in this case that you have a commissioner who said that. It's not what the law is, though. He may say that, but that's not what the law is. The commission owes no deference to the arbitrator. I think it's simply something to consider, Your Honor, in looking at what the evidence is in this case. The other issues in this case are medical and permanent partial disability. Another thing I think that is significant is that Commissioner DeVrent actually gave a dissent in this case. And he pointed out the commission's hesitance with Gornett's opinion based on the lack of chest pain in the records. But he says, based on the fact that I think the petitioner is credible and based upon the other opinions that Dr. Gornett has given, that he believes that the arbitrator's decision should stand. So this wasn't a unanimous commission decision. And Commissioner DeVrent did dissent in this case. He specifically says that he finds Dr. Gornett's opinion that pain medication that he was taking could have masked his complaints is something that's very possible. And also that petitioner did testify consistently that he had neck soreness after, but he acknowledged that he, he plainly acknowledged at the hearing that he hadn't told anybody, at least it wasn't in the records, that he had neck problems prior to August of 2008. So I think that's important that his testimony stayed consistent throughout that, throughout the time period, throughout the hearing. Okay. It's my wife. Well, I believe my time has expired, Your Honor. So thank you very much. That's her special ring. Thank you, counsel. You'll have time on reply. Mr. Reddick? Thank you. Good afternoon, may it please the Court. Mr. Reddick. Why isn't DeVrent right on this? I believe he did. DeVrent, Commissioner DeVrent. Yeah, there's a dissenting opinion of approximately two paragraphs at the end of the commission decision. On one of the greatest speeches was Lincoln's. So to answer his question, why isn't it right? Well, it's, the, there's been a lot of discussion about, first of all, I was going to address the issue of what the proper standard of review here is, and I think that it's been properly pointed out that we are looking at. Yes, it's manifestly, you can move on from there. Good, great. Yeah. That having been said, taking a look at whether or not there's sufficient evidence in the record to support the commission's decision, we need to take a look at the fact that we do have two competing opinions, Dr. Grimm and Dr. Gornett. That in and of itself indicates that there is evidence to support the commission's decision, and finding that Dr. Grimm's opinion that the petitioner's cervical condition was not causally related, there's appropriate basis for that in the record. The other part that we haven't really touched on so far is the petitioner's testimony itself. Ms. Rich mentioned the fact that the petitioner's testimony remained consistent. It remained consistent on the day of the hearing. If you take a look at the totality of the records, and you take a look at the medical histories that were given by this petitioner throughout the course of his treatment, there's a vast area of discrepancy between the two. In April of 2008, April 13, 2008, when the ambulance shows and takes a history from the petitioner, he gives a history exactly as Ms. Rich described, that being that he's in a smoke-filled room, he steps down off of a ledge, twists his left knee, hears a pop, and complains of pain about the left leg. He's then taken to the ER. His history remains essentially the same. His complaints the same. He fills out a pain chart. He limits his pain to that of the left lower extremity. Well, what about her argument, though, that the excruciating pain in the original problem was the leg? And obviously that would take priority, and then it was a few months later that it began to get headaches. Why is that so far-fetched? Well, she talks about that in support of Dr. Gornet's opinion on causal connection. He really based it on really kind of a twofold factor. Number one, the fact that he had so much pain, it was centered on that. And the other part, that he actually believed in the original records that there was evidence to show that there were cervical complaints because it masked itself or showed itself. He had some preexisting cervical condition. Is that what he said? That Dr. Gornet did? Yeah. Dr. Gornet testified that he thought that this was entirely based off of the accident from April of 2008. All right, so Grimm, was it Grimm? Some doctor indicated... Dr. Grimm does. Testifies to the fact that that's there. So what about a theory of an aggravation of a preexisting injury? Would that allow... That is an allowable theory under the Illinois Workers' Compensation Act. However, that other than the fact that you brought it up here today, up until now it's never been raised. Nobody raised it before? That's never been an issue. So you're saying Gornet's questionable because Gornet is assuming that there was this chest pain as he's being whisked off to the emergency room in an ambulance, right? His testimony is that it's, yes, twofold. That number one, that there was this neck pain that actually showed itself as chest complaints. Right. And his testimony on that is exactly contrary to the evidence in the records. If you take a look at the record, the record specifically says, no chest pain. The words chest pain are in the record, but you have to look at the preceding. There's a circle, no, no chest pain. Was it the fact that even the dissenting commissioner indicated that the medical record did not support Gornet's opinions that complaints of chest pain could be referred to the cervical artery? Well, it's important also to take a look when Dr. Gornet testified at this deposition. He indicated that when asked on cross-examination, if the evidence and the information that you relied upon in these histories and your understanding of the facts were different, might that change your opinion on causal connection? Yes. That's significant. So if they raised it below, shouldn't they have been able to win on that theory? I'm sorry, say that again. If they raised it below, would they have been able to prevail on the aggravation of the pre-existing injury theory? It doesn't have to be the sole or the proximate cause. It only has to be a cause. Correct. If they were able to provide medical evidence to show that, that's certainly a way of showing that. Well, your doctor provided it, didn't he? He merely showed that he had degenerative findings that he believed predated this. It's significant to note the fact that there's a four-month gap between the date of loss and the first time the petitioner ever documents any type of complaints related to his cervical. Let's see if we can make this real easy. Okay. There's contradictory medical evidence in the record. Correct. The commission found that the claimant was not credible because his testimony was not supported by the medical records. They, therefore, ruled against the claimant, and that's not against the manifest way of the evidence based upon the record. I would agree. Would they find him not credible? Well, as it was pointed out, the petitioner was injured while he's in his duties as a volunteer fireman. His primary job is that of a correctional officer in the state of Illinois at the Menard Center. Does that make him not credible? Not in and of itself. He testified to the fact that he was trained in reporting details related to accidents and emergency situations, that he was trained and experienced in that. He testified to the fact that he understood that the histories that he gave to his medical providers were ones that were going to be used in his treatment and that the treatment would be directed based on those complaints. There's evidence in the records that he seeks treatment with four separate providers, including the ambulance driver. And he gives a consistent history for all of those in that he trips or he steps down a twist and his complaints are limited to his left leg. So, in other words, what you're saying is that there's no, at the time, statement by him that he hit his head in some manner. Correct. He testified that he told the ambulance driver. It's not included in the records. Well, we know it's not in the records, but he testified that he told the ambulance driver. The commission just didn't believe him. And there's three other providers that they document nearly the same thing. Was he under the influence of morphine at that time? I'm sorry, what? I get this picture. He's being whisked away to the hospital and given an IV of morphine because of the excruciating pain. He did get it. He did get it. There's no testimony as to whether or not he provided that history before or after that was administered. That's our guess. Doesn't he testify, though, that at the time, I was only concerned about my knee? He did. I mean, he gave an explanation for why during his four months he didn't say anything about his neck. It's inconsistent, Your Honor, with his own described history and training and education in his primary occupation of properly documenting details of incidents such as this. Furthermore, his testimony in cross-examination, when he goes to the medical provider and asks about what bothered you, he says that he understood that at that time he needed to be completely honest and accurate and complete in his description. Well, maybe he was. Maybe it didn't bother him. But that's different than what he testified to. At trial, he testified to the fact that it did bother him. It was existing, and he was toughing it out. The commission found him not credible. There is more than enough evidence in the record to sustain that decision by the commission. Based on that and based on the fact that this case needs to be determined based on the manifest way to the evidence, I would submit that the commission's decision be affirmed. You would not dispute he has degenerative cervical disc disease? No. Thank you, counsel. Counsel, you may reply.  The pre-existing, the aggravation of a pre-existing injury theory is stated on page 24 of my brief. So that is something that we have raised here, and it's something that Dr. Gornett stated in his deposition that he believes that at the minimum this was an aggravation of pre-existing condition. What did you argue before the arbitration? Did you say anything at all about a pre-existing condition before the arbitration? Yes, Your Honor, that's part of the reason why we won, I believe, and the fact that he hadn't had any treatment before this. Did the arbitrator address it at all? No. It looks like he doesn't specifically in his decision spell out pre-existing condition. But you're saying, you argued that recovery should be had in this case based on an aggravation of a pre-existing condition. You argued that at your time. Yes, and I think that's incorporated in Dr. Gornett's deposition. I think that's where it's clearly spelled out. And in that vein, there's actually a case that is perfectly on point, and it's set out in my brief. It's called Sargent v. Lola's Uptown Restaurant. It's kind of interesting how similar these cases are. In that case, a woman fell, injured her right hip. She was taken by ambulance. Her only complaint was of right hip pain. Several months later, she started to notice back pain. And this woman had actually had documented pre-existing problems in her back. The commission still gave her an award for her back and said that it was related to the fall, despite the fact that she had not sought treatment for her back. There was several months gap in treatment, like in this case, and she had not had any complaints of back pain when she was being treated for the hip. When you started out your argument here, you never advanced the theory. You never said this is an aggravation of a pre-existing injury, did you? It wasn't until I think I brought it up. Correct, Your Honor. It is contained in my brief, so I tried to focus on as much as I could. I feel like there's a lot to cover here, but I think that is an important theory in this case.  I don't see how it could be any more consistent than what he testifies to at trial. He says, when asked, since the accident, before knee surgery, I had soreness. I just thought, well, it's part of it. I'm going to be sore for a while, and then after my knee surgery, I was taking Vicodin and Aleve and all kinds of pain medication and anti-inflammatories, and finally after physical therapy, my knee started getting better and I got off the pain pills. And that's when my pain just started gradually getting worse and worse. So that's what he testified to at trial. That's what he told Dr. Gornett. That doesn't contradict any of the medical records in this case. He does not dispute that there is no indication in the earlier records that he gave any complaints of cervical pain because he wasn't having any of that. Didn't he testify that prior to his accident on April 13, 2008, he had never suffered from any pain, no symptoms, or no medical condition of his cervical spine, and that you claim that that's corroborated by his medical record? So how can it be an aggravation of a pre-existing injury? What's the condition? The condition is the degenerative findings in his cervical spine, which Dr. Gornett and Dr. Grimm both agree are there. However, as I'm sure you all know from reading these cases, that degenerative changes in somebody's spine can be asymptomatic for a number of years, and then a traumatic event like this can cause them to become symptomatic. And that's a recognized theory under the Illinois case law. It is, but just to expedite, can you tell me what page or pages of your brief you specifically argued the aggravation of a pre-existing injury theory? It's page 24, Your Honor, towards the bottom. Well, you've got the spine defect that you said from the prior recording in an earlier case? Yes, I was making a comparison between the Sargent case and the case at hand. You're making a comparison, but did you ever specifically say this case involves the aggravation of a pre-existing condition or injury? I mean, somebody could read this and maybe gloss right over it. I suppose that is possible. I mean, that's where I thought it fit within my argument. But I see my time has expired, Your Honors. Are there any further questions? I don't believe there are. Thank you, counsel, both, for your arguments this afternoon. Thank you very much. We'll be taking your advisement, and this position shall issue. Have a safe trip home.